F. McLeod, Administrator of A. L. Dell, Appellant, vs. P. Dell, Executor of W. Dell, deceased, Appellee.

1. Neither land nor slaves will pass in this State by *nuncupative* will.

2. The 51st section of the act of 1828, on the subject of last wills and testaments, is to be taken to be restrictive in its operation, and intended to confine the testamentary disposition of both land and slaves, to wills in writing.

3. Where a testator, by *nuncupative* will, gives to his executor all of his estate, both real and personal, *in trust*, for the payment of debts, and the balance to be distributed to certain named legatees, if the devise and bequest of the land and slaves should fail, he will hold such of the chattel interests as do pass by the will subject to the payment of the debts of the estate, and not as a specific legacy.

This case was decided at Jacksonville.

The facts of the case are sufficiently set forth in the opinion of the Court.

*Banks & McLeod* and *Smith & Ives* for appellant.

*J. P. Sanderson* for appellant.

DuPONT, C. J., delivered the opinion of the Court.

The bill in this case was filed in the Circuit Court of Alachua county, by Ferdinand McLeod, as administrator on the

estate of Amos L. Dell, deceased, against Philip Dell, as executor of the last will and testament of William Dell, deceased.

The bill sets forth, in substance, that the testator, William Dell, departed this life some time in the year 1854, having previously, to wit, on the 21st day of October in that year, duly made and published his last will and testament, in the following words, to wit:

" I give and devise all my real and personal estate of whatever nature, to my brother Philip Dell, the executor of my last will and testament hereinafter nominated and appointed, *in trust*, for the payment of my lawful debts; and after that, to convey one third part of the residue of my real and personal estate to my brother Amos Dell, to have and to hold during his natural life, and to the heirs of his body forever. One third part to my sister Mary S. Dewer, to have and to hold during her natural life, and to the heirs of her body forever. And my brother Philip Dell, the executor of my last will and testament, to retain one third part for himself and the heirs of his body. I nominate and appoint my brother Philip Dell, to be the executor of my last will and testament."

The bill further sets forth that the defendant proved the said will, and entering upon the execution of the same, possessed himself of all of the testator's real and personal estate. That the inventory and appraisement filed in office by the said executor, was not made in accordance with law, and does not exhibit the true value of the estate. That sometime in the year 1856, the defendant pretended to make a distribution and settlement of the estate, but alleges that the same was made without notice to the intestate, Amos L., and without competent authority.

The bill further shows that Amos L. departed this life intestate, some time in the year 1856, leaving him surviving,

his wife Mary E. and an infant child, both of whom were living at the date of the filing of the bill, and administration on his estate has been duly committed to the complainant, and prays for an account.

The answer admits the making of the will by William Dell, but alleges it to have been a "nuncupative" will; admits his office of executor; admits omissions in the inventory filed, and alleges that they occurred through inadvertence and accident. Denies that the inventory and appraisement was not duly filed in accordance with law.

The answer further alleges that by a mutual understanding and arrangement between himself, the said intestate, Amos L. and Mary E. Dewer, the three legatees named in the will of William Dell, deceased, he did deliver to each of the said legatees, certain named negroes at certain valuations, on account of their respective interests, but *submits* whether or not he had authority to administer the said slaves by virtue of the said *nuncupative* will, and asks for the direction of the Court.

The answer further alleges, that by the consent and with the approbation of the said Amos L. and Mary E., he, as Executor, did sell the *real* estate of the said William Dell, and apply the proceeds of the same as far as they would go, to the payment of the debts of the said estate, but insists that, if it shall be determined by the Court that the real estate did not pass under the will of the testator, he shall be permitted to retain so much of the assets of the estate as did pass, to indemnify him for the debts that he has already paid and may yet have to pay.

The answer further insists that whatever interest of Amos L. passed under the will, came to the executor as a *legal* estate, and that he ought to be permitted to hold it for the benefit of the infant child, to the exclusion of the mother and widow.

18

The cause was submitted to the Chancellor upon bill, answer and exhibits; and on the 13th day of January, A. D. 1860, the following decree was pronounced, viz:

"1st. That this being a nuncupative will, the slaves and real estate did not pass under it, and that as to them the testator died intestate.

"2d. That it be referred to John S. Kirkland, Master in Chancery, to take and state the account between the defendant and the estate of William Dell, deceased, which account shall exhibit the amount and description of assets, (excepting land and slaves) which were of the estate of William at the time of his death, and which have at any time since come to the hands of defendant as Executor for distribution; and the sums which he has expended for the estate, in payment of debts of the same, and to require proof, and to state the sum of such expenditures, and also to report a schedule of the liabilities of said estate, showing the kinds of liabilities, the several amounts with the names of the several creditors; also the debts (if any) unpaid, the names of the debtors from whom the same are due, discriminating and reporting such as are attestable, and such as are desperate."

The petition of appeal filed in this Court sets forth the following as grounds of exception to the decree of the Chancellor, viz:

"1st. That the presiding Judge held that the nuncupative will of William Dell passed neither real estate nor slaves; whereas it is insisted that by operation of law both passed by the said will.

"2d. That the presiding Judge erred in not decreeing that the personal estate which he decided did pass, passed as *specific legacies*, exempted from the payment of the debts of the said testator, and that said debts should be paid from

the proceeds of the lands and slaves, which he decided did not pass, in the hands of an Administrator to be appointed."

From this statement of the case, it will be seen that two questions have been submitted by the complainant for the determination of this Court, viz: 1st. Whether under the laws of Florida, real estate and slaves, or either and which will pass under and by virtue of a *nuncupative will*.

2nd. Whether in the event that it shall be determined that the nuncupative will of William Dell did not operate to pass the real estate and slaves, so much as did pass, should not be considered as a *specific legacy*, and thereby throw upon the lands and slaves the payment of the debts of the estate.

The statute now of force on the subject of last wills and testaments, was enacted by the Legislature on the 20th day of November, A. D. 1828. The 51st section is as follows: "Every person of the age of twenty-one years, being of sound mind, shall have power by last will and testament in writing, to devise and dispose of his or her lands, tenements and hereditaments, and of his or her estate, right, title and interest in the same, in possession, remainder or reversion, at the time of the execution of the said last will and testament, and of the slaves which may be possessed by him or her at the time of his or her death: *Provided*, that every such last will and testament shall be signed by the testator, or by some other person in his or her presence, and by his or her express direction, and shall be attested and subscribed in the presence of the said testator or testatrix, by three or more witnesses, or else it shall be utterly void and of non effect."

The 52d section provides, that "no such devise or disposition of lands, tenements, hereditaments or slaves, or any part or clause thereof, shall be revocable by any other will or codicil, unless the same be in writing and made as afore-

said; but every such last will and testament, devise or disposition, may be revoked by any other writing, signed by the testator or testatrix, declaring the same to be revoked, or operating as a revocation thereof by law, or by burning, concelling, tearing or obliterating the same by the testator or testatrix, or by his or her direction or consent, or by the act and operation of law."

The 53d section provides for the making of nuncupative wills, as follows: "No nuncupative will shall be good, that is not proved by the oaths of three witnesses at least, that were present at the making thereof, nor unless proved by said witnesses that the testator or testatrix, at the time of pronouncing the same, did desire the persons present, or some of them, to bear witness, that such were his or her will, or to that effect; nor unless such nuncupative will was made in the time of the last illness of the deceased."

The 54th and 55th sections relate to the time for taking testimony as to such will, and the grant of letters and probate of the same; and the 56th section relates to revocation, and is as follows: "No will or writing concerning any goods or chattels shall be revoked, nor shall any clause, devise or bequest therein be altered and changed by any words, or will by words of mouth only, except the same be in the life time of the testator or testatrix committed to writing, and after the writing thereof, read unto the testator and allowed by him, and be proved to be done by three disinterested and credible witnesses at least."

We have collated these several sections for the greater facility of reference.

In support of the position that *lands* may be passed by nuncupative will, we are cited by the counsel for the complainant to the act of the Legislature prescribing the mode in which lands may be conveyed by *deed*. Thomp. Dig. 177, §1. The argument is, that the exception in the section in

favor of "last wills and testaments, or other testamentary appointment duly made according to law," affords sufficient ground for the position, and it is insisted that a nuncupative will which is reduced to writing after the death of the testator, is a "*testamentary appointment*" under the statute by which land may pass. This view of the statute was not much pressed by counsel, and we confess that we have been unable to perceive its force upon, or its applicability to the point at issue. To sustain the argument of the counsel would be to hold, that the *witnesses* to the nuncupative will were the *testamentary appointees* of the testator, and that he could do by *appointment* that which he was debarred by law from doing *directly* and *in propria persona.* A conclusion so illogical cannot be law.

It was further assumed that whatever might be the conclusion as to the passing of lands, there could be but little doubt respecting a nuncupative bequest of slaves, and the position was maintained with so much force and ability as to cause the Court to give to the consideration of the point more than ordinary attention. It was insisted in this connection that under the rules of the common law, slaves come under the designation of personalty, and that such is their character by the express enactment of the Legislature, (citing Thomp. Dig., 183, sec. 4, par. 1,) wherein it is declared that, "from and after the passage of this act, slaves shall be deemed, held and taken as personal property, for every purpose whatsoever." It was insisted that this was an express legislative declaration on the subject, and that such an express declaration could not be affected by any mere implication; that as personalty, it stood upon the same footing as other chattel interests, and was the subject of a nuncupative bequest; that the 51st section of the statute, (Thomp. Dig., 192,) which assumed to give the power to make last wills and testaments of lands and slaves, was

not designed to change the character of the latter, or to res-strict the disposition of the same; but that the only purpose contemplated in bringing the two into such close juxtaposi-tion, " was to show that the will was to operate only on such land as the testator might be seized of at the date of the will, and upon such slaves as he might be possessed of at the time of his death." This, if we understood the coun-sel, gives the full force of the argument as it was presented to the Court. Before proceeding to consider this argument, it may be proper to note that the act referred to as designa-ting the *character* of slaves, was approved on the 15th of November, and the other act giving the power to dispose of land and slaves, was approved subsequently on the 20th of the same month, A. D. 1828. It will also be noted that in the latter act there are no *negative* words used to enforce the restriction as to slaves, and that omission it is that gives rise to the question in this case. In this posture of the law, the Court is charged with the important duty of ascertaining and declaring the legislative will on the subject, and we confess that the task is not free from embarrassing anxiety. The books have kindly furnished a body of rules which con-stitute the canons of construction, and to them resort is fre-quently had with the most beneficial and satisfactory re-sults. But the experience of every lawyer demonstrates that these rules are merely arbitrary, and that cases are contin-ually arising which defy their application. Such is the case before us.

In proceeding in this investigation, we will not discuss the point raised by the defendant at the argument, as to how far the declaration of the legislative will, defining the status of slaves as property, contained in the act of the 15th November, is to be considered as having been *modified* by the subsequent act of the 20th November. We leave that an open question, both acts having been passed at the same

session. It is sufficient for the conclusion at which we have arrived, that the two sections originating this seeming conflict, are embraced in two separate and distinct enactments, embodying two separate and distinct subjects. The former act will be found to be on the subject of alienation of property by *deed* ; the latter, the alienation by *will.* The Legislature might well be permitted to have intended to affix to slave property different and distinct characters as viewed in the two aspects, and to become the subject of alienation by the different modes of transfer. But it is insisted that the words contained in the act of 15th November, viz : " for every purpose whatsoever," are so broad and *explicit* that they may not be restricted or controlled by any *implication* arising from the juxtaposition before referred to, as existing in the act of 20th November. It is true that these words of the section are very broad and comprehensive, but it would be illogical to invest them with a breadth and comprehensiveness which would extend their scope beyond the subject to which they were designed to relate. That subject was alienation by deed, and did not refer to or embrace the subject of wills. The very plausible position then deduced from the argument, that express words are not to yield to mere implication, must fall to the ground, so far as it is designed to affect the point at issue.

We come now to the argument based upon the omission of negative words to *restrict* the willing of slaves to the particular mode prescribed in the act of the 20th November, and it is urged that this omission is significant of the intention of the Legislature to do no more than to declare what property should pass under the will ; whether such as was in possession at the *date* of the will, or such as might be in possession at the death of the testator. But in reply it may be asked, *cui bono ?* The law had long been settled and well understood that, in a general devise of lands, only such as

were in possession of the testator at the *date* of the will would pass, while in a general bequest of personalty, all that was in possession at the *death* of the testator would pass. We are of the opinion, then, that some other motive must have operated to have induced the Legislature to take slaves out of the category common to personalty, and to place it in close juxtaposition with land. That motive we are of opinion was to place that species of property upon an equal footing with realty, and the following enactments confirm us in that opinion.

It will be seen by reference to the act of the 20th of November, before referred to, that no devise or bequest of lands or slaves can be *revoked,* unless the writing declaring the intention to revoke be executed and attested with all the formalities required to make the devise or bequest, while in the case of "*goods or chattels,*" the revocation may be effected by merely reducing the words to writing in the life time of the testator, and having them *allowed* by him. In the latter case, no signing or attestation of witness is required, as is essential in the former.

Again, the same distinction is kept up with respect to the effect of the *probate* of wills intended to pass the two kinds of property. While the probate of a will of goods and chattels is declared to be conclusive of the validity of the same, that of one embracing lands and slaves is declared to be only *prima facie* evidence. Now, if it were not the design and intention of the Legislature to descriminate between slaves and other chattels, and to take that species of property out of the category of personalty, why this difference in the mode of *execution, revocation,* and *probation ?* There must have been a purpose, and that purpose is clearly indicated by the juxtaposition in which it is found.

In support of the position taken by the counsel for complainant, we have been cited to the case of Sampson vs.

Browning, (22 Georgia R. 293,) which was a case where both land and slaves were conveyed by nuncupative will, and the Court held that the slaves passed, but that the lands did not. It is a sufficient reply to that authority to remark, that the Legislature of the State of Georgia has never enacted a statute on the subject of wills, but have only *adopted* the British statute, in which, of course, none of the discriminations in favor of slave property, above referred to, are to be found. The case then is of no authority on the point under discussion.

The Court has also been cited to the language of the North Carolina statute, which it is contended is even stronger than the language of our statute, and in that State it is asserted, there has never been any doubt but that slaves would pass by a nuncupative will. The language of that statute is as follows : " No last will and testament shall be good or sufficient in law or equity, to convey, or give any estate, real or personal, unless such last will shall have been written in the testator's life time, and signed by him, &c." As in the citation from Georgia, it will be seen that in the North Carolina statute, there is no intimation of a purpose to *discriminate* between slaves and other personal property, and consequently the application of the authority is obnoxious to the same objection. We conclude then that it was the purpose of our Legislature in the enactment of the 51st section of the act of the 20th Nov. 1828, to withdraw slaves from the class of personalty to which they belong for ordinary purposes, and to place them upon an equal footing with realty, whenever a testamentary disposition is to be made of them; and there is good reason for this. The growth and progress of the " peculiar institution " in the Southern States, has inspired sentiments which impart to that particular species of property even a greater degree of

19

permanence than is accorded to realty. It is the cherished subject of inheritance, and a man under the stress of adverse circumstances will strip himself of every other species of property, even the old "homestead," the scene of his early childhood, before he will consent to part with his slaves. A feeling of benevolence prompts him to maintain the integrity of the patriarchal relation, by transmitting them to the care and protection of the surviving family. With these views, therefore, the Court are of the opinion, that there is no error in the decree of the Chancellor, which declares that the land and slaves embraced in the nuncupative will of William Dell, deceased, did not pass by operation of the same, and that in respect to these, he is to be considered as having died intestate.

The next question presented at the argument for the consideration of the Court, was as to the *character* of so much of the bequests as did pass under the will, whether the same were to be considered as *specific*, and thereby exempted from the payment of the debts, or *general*, and consequently subject to that charge.

A reference to the definitions of the two kinds of legacies, and especially to the language of the will, will leave but little room for doubt on this point. A regular *specific* legacy may be defined, "the bequest of a particular thing, or money specified and distinguished from all others of the same kind, as of a horse, a piece of plate, money in a purse, stock in the public funds, a security for money, which would immediately vest with the assent of the executor." 1 Roper on Leg. 191.

There may be a "specific bequest" of *general* personal estate, but to give the bequest that character, the same *incidents* must attach that occur in a bequest of money; the money must be so described by the testator as to empower the legatee to say to the executor, deliver the sum bequeath-

.ed to me, which is in a particular chest, bag or purse. ' The .bequest of all a person's personal estate generally, is not specific.; the very terms of such a disposition demonstrate its generality. But if A. bequeath to B. all his personal estate *at* C. or in a particular house or country, the legacy will be specific, for it is confined in its extent, and falls within the description before given of such a legacy. B. can say to the executor, deliver to me all of A's. personal estate *at* C. or in a particular house or country, for I am entitled to receive it *in specie*. *Ib.* 242.

Tried by these *tests*, there cannot be a shadow of doubt as to the *general* character of the bequest contained in the will of William Dell. But the specified object of the bequest *" in trust"* is equally significant. That object is declared . to be first "for the payment of my lawful debts, and .after that to convey, &c." Independent of the general principle respecting the assets out of which the debts are to be first paid, there is in this will a special *trust* for that purpose, and as nothing but the personal estate, other than slaves, passes by the will, the executor's duty is plain: to proceed to its application to that purpose. Should the assets in his hands be insufficient to pay all of the debts, the creditors will have a right to resort to the unadministered lands and slaves for the balance of their claims.

This disposes of the case, so far as the rights of the complainant are concerned, but a prayer for *indemnity* is interposed on the part of the defendant, which may deserve consideration.

The answer of the defendant sets forth that acting under the belief that the devise of the real estate was valid, he, with the consent and full approbation of his co-devisees, concluded to sell the lands belonging to the estate, for the purpose of paying off the debts, and asks that the said sale be either confirmed by decree of the Court, or that he be al—

lowed to retain the personal assets for the purpose of refunding the purchase money received for the same, and which has been applied to the payment of the debts of the estate.

It is very obvious, in view of the conclusion which has been reached respecting the devise of the real estate, that the Court has no authority to adjudicate touching any interest connected therewith. The real estate belongs to the proper heirs of William Dell, deceased, and they are not now before the Court. So far as the retention of the personal assets are concerned, for the purpose of indemnity, there can be no difficulty about it, as in the account to be taken, the defendant, under the order of reference, is to be allowed a credit for all proper disbursements which he may have made on account of the estate.

Let the decree of the Chancellor pronounced in this cause be affirmed, with costs.