BERENICE HOUSER LEFFLER v. CORNELIA LEFFLER, individually and as Executrix of the Last Will and Testament of Charles D. Leffler, deceased; and CHARLES D. LEFFLER, JR.

10 So. (2nd) 799 En Banc
July 7, 1942 On Rehearing December 18, 1942

Mitchell D. Price, Zaring, Florence & Kirchik, for appellant.

Hudson & Cason, for appellees.

CHAPMAN, J.:

The record in this case discloses that Charles D. Leffler, in 1890, married H. May Leffler and they had two children; Cornelia Leffler, born in 1892, and C. D. Leffler, Jr., born in 1896. Shortly after marriage they purchased, largely with borrowed capital, a mercantile business then located at Sanford, Florida. It was operated and managed jointly by Charles D. Leffler and H. May Leffler, the latter keeping books and discharging all the office work. It was shown that a considerable portion of the sales of the business was had or made on requisition which necessitated a great deal of clerical and office work. The borrowed capital of the business was returned and the busines continued in operation from the year 1891 to 1899, when the parties sold the business, retaining some of the store fixtures and moved to Miami, Florida, where they bought a home and opened a grocery store.

The parties owned and operated the grocery store in Miami very much like the one formerly operated at Sanford, where the husband sold the merchandise and met the public, while the wife took charge of the books and dispatched all the office work, giving all of her time to the assignment. During the year 1908 the grocery business was sold for a sum of between $4,000 and $5,000 as the parties had an opportunity to take over an oil sales agency for the Gulf Refining Corporation in Miami and vicinity. This agency was operated by C. D. Leffler and wife, H. May Leffler, from the year 1908 until the death of H. May Leffler on May 3, 1930, and was operated as a joint business during her lifetime, and after her death C. D. Leffler continued the operation thereof until it was sold in 1934. While the business was being operated from 1908 to 1930, C. D. Leffler, with employed salesmen, solicited business in the area and thereby established a lucrative business and simultaneously his wife, H. May Leffler, gave her entire time to the bookkeeping and office duties of the business until shortly prior to her death.

The profits from the business increased from time to time over the years. Wise investments of the surplus money was made, and during the year 1935 the value of the estate was fixed at the sum of $530,000.00. Important factors in the accumulation of this valuable estate can or may be traced to the combined or joint energy, industry, perseverence and devotion of the parties to the work, coupled with the uncanny business acumen of C. D. Leffler in making sound investments. Rarely is there observed such an unique combination of business ability and judgment as that possessed and demonstrated by these parties. The

title to the home was placed in the name of H. May Leffler. H. May Leffler executed a will and by the terms of which she bequeathed a life estate in the home to her husband, and after his death it was to go to her daughter, Cornelia Leffler. The residue of all her property was demised and bequeathed to her daughter, son and husband, share and share alike.

On June 26, 1935, C. D. Leffler married Berenice Houser Leffler, and serious business complications immediately arose. Cornelia Leffler anticipated legal difficulties with her stepmother over the legal rights to the estate of herself and her brother. She had discussions with her father in an effort to clarify the situation. The father, on July 12, 1935, made a will and by the terms thereof one-third went to Cornelia Leffler, one-third to C. D. Leffler, Jr., and one-third to his wife. Shortly after executing the will, C. D. Leffler, Sr., joined by his wife, transferred all of the property appearing in his name to the Post Office Garage Corporation, said corporation having a capital stock of one hundred shares of no par value. The corporation issued thirty-three shares of stock to Cornelia Leffler, thirty-three shares to C. D. Leffler, Jr., while C. D. Leffler, Sr., retained thirty-four shares for himself. Each share was valued at $5,300.00.

The Treasury Department of the Federal Government observed of record in Dade County the transfer of the property by C. D. Leffler and Berenice Houser Leffler to the Post Office Garage Corporation, which resulted in a claim or demand by the Treasury Department of the sum of $53,000.00 as a gift tax. The late Mr. Leffler resisted payment and employed a tax expert and an attorney to represent him, when an affidavit was prepared by the attorney, after consul-

tation with Mr. Leffler, and the latter executed the same and filed it with the Treasury Department. After considering the affidavit, the Treasury Department reduced its claim from the approximate sum of $53,000.00 to the sum of $10,500.00, which was paid by Mr. Leffler.

A copy of the affidavit appears in the record and pertinent provisions thereof are viz:

"That during the period from 1891, when affiant and his wife opened their first business in Sanford up until about 1910, when their oil business in Miami first began to show a substantial return, there was a tacit understanding between the affiant and his wife that their business belonged to them jointly, but since their earnings had been comparatively small, and during this period has been used principally in building up their business and for living expenses, they had considered and discussed ownership as between themselves very little; that during this period very few investments outside of their business had been made, and so far as affiant has been able to recall or ascertain said investments were as follows:

". . . That by about 1910 this situation had changed, they had a business established which was beginning to make good money, their home was paid for, their children Cornelia (who was born in 1892) and Charles (who was born in 1896) were getting to the age where their education and future had to be considered and planned, and as affiant now recalls it was about time in 1910 when he and his wife first had a detailed discussion of their finances and definitely and expressly agreed between themselves as follows:

"(a) That the home property (Lot 1, Block 107-A Miami South) was to be held by Mrs. Leffler as her separate property;

"(b) That all other property which they had and all which they might thereafter acquire from the operation of their said business was to be 'family property'—that is, that it was to be owned by affiant and his wife, share and share alike, regardless of in which ones name the title was taken, and

"(c) That at the death of either affiant or his wife such 'family property' was to be divided equally between the survivor and their two children, Cornelia and Charles D. Leffler, Jr.,

"That at all times after the aforesaid agreement was entered into about 1910 the affiant and his wife operated their said business and invested the profits therefrom with the clear and express understanding between them that the business and all investments belonged to them, share and share alike, and that at the death of either affiant or his wife, all of said property was to be divided as above set out. . . .

"That shortly after his wife's death affiant and Charles D. and Cornelia Leffler, being the executors and all the heirs of M. May Leffler's estate, discussed what action should be taken with respect to his wife's said estate, and at that time they decided that the family savings account, which had been in the name of 'C. D. or H. May Leffler' would be carried in the name of affiant and Cornelia Leffler; that affiant, with the counsel and advice of Cornelia Leffler, would continue to operate the said oil business for himself and the estate of H. May Leffler and handle the family property in the same way as he had done prior to Mrs. Leffler's death; . . ."

On January 20, 1937, C. D. Leffler addressed a holograph letter to his attorney viz:

"Johnson H. Pace, . January 20, -37.
City.

"Dear John—I have thought over the Matter of *my will* & I believe you have a copy of it, the copy or rather the original is some where but I can't locate it but think it must be in the lock box in the Fla. Nat. Bank x What I am getting at is that after thinking over the matter I am not satisfied with it,

"You will recall that it divides my estate into *thirds* after my estate has already been divided 3 ways which I feel is fair to my children, I want you to draw a will leaving thirty shares of the P. O. Garage to my wife & any bank account I may have, I now have 2 bank accounts—C. D. Leffler Personal & C. D. Leffler Agent, these two accounts are all the cash I have in bank, the 10,000.00 insurance I have is company insurance & dependent on my staying with the company the other insurance $54,000.00 is already made to my children x I want to leave 2 shares of P. O. Garage Stock to each of the children this would be 30 shares to my wife—2 shares to Cornelia & 2 shares to Charles. C. D. LEFFLER.

"I have not talked this to a single person *not even my* wife but feel to have to divide my 1/3 three ways again or stating it another way leaving my wife 1/9 of what I have is *not fair* to her x I feel that I have already made a fair divide of what I have accumulated along with my first wife's assistance—
Witness C. D. LEFFLER.
J. E. PRESTON
C. S. JOHNSTON."

On February 23, 1937, C. D. Leffler executed a will. This will nominated his wife, Berenice Houser Leffler, and his daughter, Cornelia Leffler, as executrixes. The parties were appointed Executrixes and each is before the Court individually and as Executrixes. Pertinent provisions of the will are viz:

"First. It is my will, wish and desire that all my just debts, funeral expenses and all other charges be paid out of my estate by my Executrixes hereinafter named, as soon after my demise as may conveniently and lawfully and without sacrificing property for this purpose, be done.

"Second I give, devise and bequeath to my wife Berenice Houser Leffler, thirty (30) shares of the capital stock of Post Office Garage Company, a Florida corporation, and I also give, devise and bequeath to her any and all moneys that I may have to my credit in any Bank or Trust Company at the time of my death.

"Third: I give, devise and bequeath to my daughter, Cornelia Leffler, two (2) shares of Capital stock of said Post Office Garage Company, and the remaining two (2) shares of the capital stock of said Post Office Garage Company that I now own I give, devise and bequeath to my son, Charles D. Leffler, Jr. In the event, however, I survive my said son, Charles D. Leffler, Jr., said two shares of stock shall go and be paid to his child or children.

"Fourth: All the rest, residue and remainder of my estate, both real and personal, of whatsoever kind or character and wheresoever situated, I give, devise and bequeath to my wife, Berenice Houser Leffler, my daughter, Cornelia Leffler, and my son, Charles D. Leffler, Jr., share and share alike, absolutely.

"Fifth: I hereby nominate, constitute my said wife, Berenice Houser Leffler, and my said daughter, Cornelia Leffler, joint Executrixes of this, my last will and testament, and I hereby expressly authorize them, my said Executrixes, to sell, lease and convey the whole or any portion of my estate for the purpose of paying debts, and/or otherwise, at either public or private sale, with or without notice, and without securing any previous order of court therefor, and upon such terms and conditions as to them may seem best."

L. D. Leffler died April 27, 1939. Chapter 18999, Acts of 1939, Laws of Florida, commonly known as the "Stepmother Act," became a law only six days prior to the date of his death. The effect of the application of the "Stepmother Act" to the facts and the will in the case at bar resulted in Cornelia Leffler and C. D. Leffler, Jr., each receiving one-third of the $530,000.00 estate, while the stepmother shared her one-third of the estate equally with Cornelia and C. D. Leffler, Jr. The Stepmother Act limited or restricted her to a one-ninth interest in the entire estate.

Berenice Houser Leffler, the stepmother, brought suit seeking a declaratory decree adjudicating the respective legal rights of herself, Cornelia Leffler and C. D. Leffler, Jr., under the several provisions of Chapter 18999, *supra*. If the Act is sustained, it is asserted, and applied to the will dated February 23, 1937, then Cornelia Leffler and C. D. Leffler, Jr., become the owners of two-thirds of the estate under the law of descent and distribution. If the law of descent and distribution is applied, then certain designated advancements previously made to the children by the

late Mr. Leffler and the entire estate should be brought into hotchpot prior to distribution.

Cornelia and C. D. Leffler, Jr., by answer asserted the ownership of thirty-three shares each in the Post Office Garage Company and also that L. D. Leffler, Sr., at the time of his death owned thirty-four shares; and that as such children and heirs of the late C. D. Leffler, Sr., under the law of descent and distribution they became the owners of two-thirds of the thirty-four shares of said stock and of two-thirds of all other property owned by their father at the time of his death. There was a decree entered for the defendants below and an appeal therefrom has been perfected to this Court.

The appellant poses for adjudication by this Court questions five to eighteen and contends for several reasons the several provisions of Chapter 18999, Acts of 1939, *supra,* are inapplicable to the last will of C. D. Leffler, Sr. It is admitted that the Act became a law prior to the death of the late Mr. Leffler. The questions raised touching the validity of the "Stepmother Act" have been decided by this Court adversely to the contention of counsel for appellant. See Adams v. Adams, 147 Fla. 267, 2 So. (2nd) 855.

The letter dated January 20, 1937, written by the late Mr. Leffler to his attorney expressed a desire on his part to make a more liberal provision for his wife (the appellant) than was expressed in the will dated July 12, 1935. Pursuant to this view the will dated February 23, 1937, was prepared and executed. Chapter 18999, *supra,* had not been enacted at the time the will was executed. It became a law on April 21, 1939, and Mr. Leffler died six days thereafter on April 27, 1939. The Act was sustained by this Court as against

the grounds of attack here presented. See Adams v. Adams, supra. One of the essential questions presented for adjudication is: should the will be held invalid in so far as it conflicts with the provisions of Chapter 18999, *supra,* but otherwise sustained? Counsel for appellant contend that the will is invalid and that the late Mr. Leffler died intestate. Counsel for appellees contend that the will is invalid only as it runs counter to the provisions of Chapter 18999, and that for all other purposes the late Mr. Leffler died testate.

Thus is presented a will the terms of which are valid and legal in part and invalid and illegal in part. It is settled law that the legal portions of such a will, if capable of being separated from the illegal or invalid portions, if the intention of the testator can be given full effect, should be sustained or by the courts upheld. See Albury v. Kemp, 63 Fla. 329, 58 So. 34; Perkins v. O'Donald, 77 Fla. 710, 727, 82 So. 401. The rule is expressed thusly by Redfearn on Wills and Administration of Estates, page 178;

"Seventh.—If the intention of the testator can not be given full effect, it will be carried out as far as possible. If the provisions of a will are partly legal and partly illegal, the legal parts will be upheld if capable of separation from the illegal. If the whole will so constitutes one testamentary scheme that the legal parts alone can not give effect to the testator's intention, then the whole will fails."

Likewise Schouler on Wills, Executors and Administrators, Vol. 2 (6th Ed.) par. 902, pages 1039-41, follows the rule enunciated by Redfearn and is viz:

"902. Partial Invalidity; Separable Provisions.— Where the invalid portions of a will can be separated

from those which are valid without doing violence to the general testamentary scheme the invalid clauses will be disregarded and those that are valid will be upheld.

"So a gift to legatees may stand, although a direction connected with it for disposition is void, and although a codicil relating to accumulation of trust funds may be inoperative in that respect still it must be read with the will to determine the intention of the testator.

"Where one provision in a will is void as creating a perpetuity this may not render invalid earlier valid provisions, and a general scheme to give his estate to his blood relations may not be affected by the invalidity of the subsequent clause providing for maintenance of the daughters, and a devise to certain beneficiaries may be upheld although the trust attempted to be created for them was invalid.

"Where the will provides for successive estates the invalidity of one may not affect the others as for example, the invalidity of a trust in remainder may not affect the validity of a trust for the life tenant, and where there are no limitations the validity of the second may not destroy the first, and a bequest of a vested remainder may not be invalid because limited to take effect at the expiration of a void trust.

"So a clause providing for an unlawful accumulation may be stricken out and the balance stand, and where a statute limits the time during which a charity may hold land a devise in fee may be limited to the time allowed by statute.

"The invalidity of certain clauses may make the will invalid as to personal property, but valid as to real estate."

The second paragraph of the will falls within the inhibitions of Chapter 18999, *supra,* and is invalid. See Adams v. Adams, supra. The testator by a will, under the Probate Act (Chapter 16103, Acts of 1933, Laws of Florida), can or may direct his executors to pay such debts as may exist against his estate, inclusive of the testator's funeral expenses and other lawful debts as expressed in Section One of the will. The law grants to a testator the power to name the Executrixes of his will and authorizes the sale by them of property to pay the debts, if any, as was provided by Section Five of the will. Authorities of high repute hold that a will can be sustained if it only appoints or nominates an executor. See In re Hickman's Estate, 101 Cal. 609, 36 Pac. 118; Fontaine v. Fontaine, 116 Ark. 1077, 277 S. W. 867; Mulholland v. Gillan, 25 R. I. 87, 54 Atl. 928; Blacksher Co. v. Northrup, 176 Ala. 42, 57 So. 743, 42 L.R.A. (N.S.) 454; Bayeaux v. Bayeaux, 8 Paige (N.Y.) 333; In re Douglas' Estate, 303 Pa. 227, 154 Atl. 376; Jones v. Richardson, 5 Metc. (Mass.) 247.

Counsel for appellant asserts that the controlling rule that should be applied is not whether the late Mr. Leffler left a will, but whether the property of the estate passed according to the terms of the will or according to the statute of descent and distribution. If it passed to the devisees and legatees under the will, then Mr. Leffler died testate. If no part of the property of the estate passed by the will but by the statute of descent and distribution, then Mr. Leffler died intestate. Many cases are cited to sustain this view. The lower court held that Mr. Leffler died testate and we fail to find this error in this ruling.

Questions one and three posed by counsel for appellant are answered by this holding.

Counsel for appellant contends, under questions two and four that the late Mr. Leffler died intestate and that the sixty-six shares of stock in the Post Offiice Garage Company issued on July 15, 1935, to Cornelia Leffler and C. D. Leffler, Jr., should be considered and recognized as advancements and controlled by the provisions of Section 164 of Chapter 16103, Acts of 1933, commonly known as the Probate Act; and that each share, valued at $5,300.00, and all of the other property should be brought into hotchpot and divided equally, or share and share alike, between the stepmother (the appellant) and the children of the deceased, Cornelia Leffler and C. D. Leffler, Jr. The learned chancellor below was of the view and so held that Section 164 *supra* was inapplicable where the decedent left a will as in the case at bar; that the Stepmother Act prohibits a childless widow (the appellant here is childless) of a decedent from taking property under a will when the decedent left lineal descendants and that she is hereby limited to the right of dower named in the Act viz: a child's part; and that the doctrine of advancements does not apply when the decedent left a will. The reasons for the rule are that the testator considered and carefully determined the several sums, if any, previously made or advanced to the devisees or legatees and accounted for the same when drafting the terms of the will. Many respectable authorities support or sustain this rule.

The evidence suports the conclusion that the stock of the Post Office Garage Company transferred to Cornelia Leffler and C. D. Leffler, Jr., on July 15, 1938,

was done pursuant to the family agreement reached during the year 1910 and continued in existence until July 15, 1935. It was agreed "that all property which they had and all which they might thereafter acquire from the operation of their said business was to be family property, that is, that it was to be owned by affiant and his wife, share and share alike, regardless in which ones name the title was taken"; and "that at the death of either affiant or his wife such family property was to be divided equally between the survivor and their two children, Cornelia and C. D. Leffler, Jr." Mr. C. D. Leffler, Sr., uttered these words during the month of August, 1938. The Treasury Department had them before it when an order was entered reducing the amount of its gift tax claim from the sum of $53,000.00 to $10,500.00. The facts appearing in the affidavit have not been impeached or discredited. On the other hand, these facts have been corroborated and reasserted by the testimony of Johnson H. Pace, the family attorney; and by Mr. Felix, a tax attorney, who assembled and placed them in affidavit form, after a conference with the late Mr. Leffler, and observed him sign the affidavit. Likewise by Mr. Jones, an employee and office manager of the oil business from 1924 until the death of Mr. Leffler; and Mr. Van D'Elden, an auditor and accountant rendering services to Mr. Leffler. These witnesses quoted Mr. Leffler as stating that all the property was the "family jackpot."

On June 26, 1935, Mr. Leffler married the appellant. All the property appearing in his name was transferred by appropriate legal documents to the Post Office Garage Company during July, 1935, being less than thirty days after date of their marriage, and

appellant joined in the conveyances. The Post Office Garage Company immediately issued stock and in this manner observed and carried forward the family agreement and divided the "family jackpot" between the survivors viz: Cornelia Leffller, C. D. Leffler, Jr., and C. D. Leffler, Sr. Mr. Leffler executed the 1935 will and the "family jackpot" was thereby divided according to the family agreement. He had executed a will and the transaction was closed. Some two years later he desired to make a more liberal allowance to his wife (appellant) and in 1937 executed a second will devising and bequeathing to her thirty shares of stock in the Post Office Garage Company and all moneys on deposit with banks appearing in the name of C. D. Leffler, Sr. This provision falls within the inhibitions of Chapter 18999, *supra,* or the Step-mother Act.

It is contended that the alleged family agreement was illegal and void for numerous reasons. Legally this contention may be accurate, but it was a moral and binding force on the members of the Leffler family and no person appearing on this record owned or possessed an interest that could or may have been prejudiced by the agreement. The agreement was in existence for many years prior to appellant's marriage to the decedent. We have not overlooked the administration of the estate of H. May Leffler as disclosed by copy of the probate proceeding appearing in the record. Careful consideration has been given to each phase of the case. We fail to find error in the record.

The decree appealed from is hereby affirmed.

BROWN, C. J., WHITFIELD and THOMAS, JJ., concur.

TERRELL, BUFORD and ADAMS, JJ., dissent.

ADAMS, J., dissenting:

The testator by his purported will evidenced a primary interest to give the major portion of his property to his widow. This was precluded by the Step-Mother Act. It is obvious that if the remainder of the will is upheld it will result in doing that which the testator did not intend, namely that the son and daughter keep the advancements and also receive a child's part in the estate. No instrument can be recognized in law as a will unless it expresses a lawful purpose. My view is that Leffler died intestate and the doctrine of advancements was applicable. Unless he was wholly intestate Section 164 of the Probate Act would not apply because it relates to "an intestate" and not to a portion of the estate which may not be covered by the will.

BUFORD, J., concurs.

TERRELL, J., agrees to conclusion.

### ON REHEARING

PER CURIAM:

Pursuant to an order granting a rehearing in the case at bar, oral arguments were heard on the part of counsel for the respective parties for the second time, when additional briefs in support of the various contentions of counsel were filed in the cause. These briefs have been studied, the authorities cited examined and the record again carefully considered in the light of the argument and contentions of counsel; and the court, after a careful consideration of the entire record, is now advised of its judgment to be entered in the premises: it is therefore upon consideration ordered by the Court that the original opinion in the case at bar as prepared by Mr. Justice CHAP-

MAN be, on rehearing granted, adhered to and reaffirmed.

It is so ordered.

BROWN, C. J., WHITFIELD, CHAPMAN and THOMAS, JJ., concur.

TERRELL, BUFORD and ADAMS, JJ., dissent.